**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 13-10296-DPW |
| | ) | |
| | ) | |
| VERISSIMO TAVARES | ) | |

<u>**TRIAL BRIEF OF THE UNITED STATES**</u>

In accordance with this Court's Pretrial Order dated May 20, 2014, the United States, by its undersigned attorneys, respectfully submits this Trial Brief to summarize the government's case and identify relevant evidentiary and other issues. The trial of this matter is presently scheduled to begin on August 4, 2014.

**I.    <u>SUMMARY OF GOVERNMENT'S CASE</u>**

On October 10, 2013, a grand jury in this district returned a one-count indictment against Verissimo Tavares ("**TAVARES**" or "the defendant"). It alleged that, on August 4, 2013, **TAVARES** was in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1) (felon-in-possession).

The chain of events leading to **TAVARES'** arrest was initiated shortly after midnight on Sunday, August 4, 2013 when Boston Police Department Officers responded to a call for a fight/loud party in progress at Barry Park, a short dead-end street located not far from

the heart of the Bowdoin/Geneva corridor.1  When officers arrived in the area, they saw that a noisy party was ongoing on Barry Park but that a much larger "block party" was in progress on adjacent Clarkson Street.   There were dozens of people at these events which spread up and down much of Clarkson Street between Quincy Street and Hamilton Street. There were scores of people milling around Clarkson Street and numerous cars parked in the middle of this narrow residential street, the net result of which was that travel on the road was constricted.   These areas are identified on the map/aerial photo attached as Exhibit 1.

BPD Officers Layden, McMenamy and Feliciano (all in uniform and in marked units) arrived in the area of Barry Park (a short-dead end residential street that is approximately 15 feet higher than adjacent Clarkson Street) at about 12:40A.M.  They found no fight, but did find a loud party going on and the much larger party in progress on adjacent Clarkson Street.   The officers proceeded to try to disperse the crowd on Barry Park and ask people there to keep the noise down.

While these officers were on Barry Park attempting to restore order, they heard multiple gun shots that they believed were coming from Clarkson Street.   Officer Feliciano called in the report and was able to determine that there had been a Shotspotter activation for multiple gunshots at 12:41:59 A.M. in the area of 66-70 Clarkson

---

1   That dispatch was made in response to a 911 call received by the Boston Police Departmentat12:34:02A.M.   A draft of that Transcript is included as part of Exhibit

Street (approximately one-half block away but inaccessible to the officers due to the difference in elevation between Barry Park which, as set forth above, overlooked Clarkson Street by approximately 15 feet) and was separated by a fence.  A map showing the location of the Shotspotter activation is attached as Exhibit 2.[2] Three 911 calls were received by the Boston Police Department from Clarkson Street residents about the shots fired between 12:42:44A.M and 12:43:18 A.M.[3]

Officers Layden and McMenamy ran to the fence at the end of Barry Park in an effort to see what was going on in the direction of the shots they had just heard.  Although the officers were blocked from getting directly onto Clarkson Street by the fence with a large drop off, they each heard a motor scooter going the wrong way on Clarkson Street (Clarkson Street is a one-way street between Quincy and Hamilton) toward Quincy Street. Officer Layden (who was the taller of the two officers) was able to see the driver of the scooter and noted that he was wearing a red T-shirt and a helmet that obscured his face.  The officers were also able to determine that, as this individual raced to the top of Clarkson Street, he took a right and

_____

[2] The Shotspotter Gunfire Detection System is a series of sensors deployed throughout certain areas of the Boston that are designed to listen and report the loud bangs of gunfire.   Whenever such noises are detected, the sensors triangulate and identify the location from which the system believes the gun fire came from on a map.   Officer Matthew Hogardt, who helped set up the system, worked as its administrator for many years and is currently responsible for quality control issues with the system, will introduce the documents evidencing the Shotspotter activation at 70 Clarkson Street at 12:41:59 A.M. on August 4, 2013 and the recording of the noise that activated it.

[3] The substance of these calls is described more fully below.

headed down Quincy Street towards Bowdoin Street.

Other officers heard the report of shots fired and responded. Officer Wozniak approached the area from Bowdoin Street in a marked unit and saw a male (later identified as **TAVARES**) driving the scooter down Quincy Street (from Clarkson Street) in his direction.  Officer Wozniak blocked the intersection with his unit so as to stop **TAVARES** from driving away.

As **TAVARES** drove down Quincy Street towards Wozniak's waiting unit, Officers Layden and McMenamy ran up Barry Street and then down Quincy Street towards Clarkson.  As they did so, they saw **TAVARES** riding the scooter down Quincy Street towards Bowdoin Street where Officer Wozniak was waiting.

As **TAVARES** approached Bowdoin Street and Wozniak's waiting cruiser, **TAVARES** slowed as if he might stop but then took a quick U-turn and began driving back up Quincy towards Clarkson where Layden and McMenamy were waiting. Both officers were standing in the intersection of Clarkson and Quincy Streets and Layden had his weapon drawn and at the low ready position, i.e., held  the barrel facing down and not aimed at any particular object.

As **TAVARES** headed towards them, the officers ordered him to stop both by yelling and putting up their hands.  **TAVARES** disregarded their orders and took a left back down Clarkson, with Officer Layden getting close enough to **TAVARES** on the scooter to be able to briefly

4

grab a piece of **TAVARES**' clothing.  Although the officers forced **TAVARES** to slow down, he proceeded back down Clarkson, i.e., towards the area where the officers had first seen him riding.

Once **TAVARES** drove past them and proceeded down Clarkson Street, both officers chased after him.  Although in ordinary circumstances, they might have little chance of catching **TAVARES** and his scooter, both officers believed that **TAVARES**' progress would be severely impeded by the large number of partiers milling around the street and the many cars double parked on it.  A photo looking up Clarkson showing its narrowness when cars were merely parked on both sides of the street is attached as Exhibit 3.

And that's exactly what happened.  Although **TAVARES** initially gained ground on the pursuing officers, he soon reached the crowd and cars blocking Clarkson Street that impeded his progress as he attempted to weave his scooter through the many obstacles.  As **TAVARES** did so, Layden and McMenamy (who had not yet hit the crowds that began some distance down the street) were able to begin to gain ground on him.

**TAVARES**' progress was really slowed when he lost control of his scooter in the area of 59 Clarkson and hit a curb causing both he and the scooter to crash to the ground (see photos taken shortly after arrest and attached as Exhibit 4).  Although **TAVARES** was able to get up after crashing, he had lost a considerable portion of his lead

and was now, like the officers, on foot.  As he got up and resumed his flight, the officers were approximately 20 feet away and gaining.

The officers continued to gain ground on **TAVARES** (who was fleeing down the sidewalk) to the point that Officer Layden (who was running down the street) was able to pull nearly parallel to him in the area of 66 Clarkson and saw a silver object in **TAVARES** right hand that Layden identified as a firearm.  Officer McMenamy, who stayed on the sidewalk and was thus chasing **TAVARES** from the rear, saw **TAVARES** take an object out of his pocket and then run with both hands pumping, but was unable to see what the object was.

As the chase continued down Clarkson Street, another unit had come on to the scene from the opposite end of Clarkson Street (by driving up Clarkson Street from Hamilton). This unit was an unmarked gang unit vehicle containing Officers McGrath, O'Brien, and Bernier who were responding to the earlier call for shots fired.  McGrath and his partners (all in plain clothes but wearing badges) pulled their unmarked unit up the street as far as they could, got out of their cruiser and stood in the area of 71 Clarkson Street looking for the officers and the person they were chasing to emerge from the crowd in the fairly well lit street.  Soon, Officer McGrath saw a male (**TAVARES**) running in their direction followed by Officer McMenamy.  As **TAVARES** got to within 10 feet or so of McGrath, he saw a silver object in **TAVARES'** right hand that McGrath identified as

6

a firearm.  As **TAVARES** got even closer, McGrath watched as **TAVARES** threw the firearm over a fence at 71 Clarkson moments before he was tackled by the gang unit officers.  McGrath and his fellow officers tackled **TAVARES**, brought him to the ground, and secured him. As they did so, McGrath yelled out that **TAVARES** had thrown a gun and, as soon as **TAVARES** was secured, immediately went into the yard of 71 Clarkson (where McGrath had seen **TAVARES** throw the gun) to find it.  Once in the yard, McGrath found the gun, notified he fellow officers that he had it, and stayed with the gun until detectives arrived to take photographs and process the gun into evidence. Photographs of the gun in place are attached as Exhibit 5.[4]

The firearm Officer McGrath located in the yard of 71 Clarkson Street after seeing **TAVARES's** toss is a Titan .25 semiautomatic handgun bearing serial number D910246 that contained 5 rounds of .25 caliber ammunition.  The gun was successfully test fired and the ammunition it contained was certified to be ammunition by BPD's Ballistics Unit.  The firearm and the ammunition were also fumed for fingerprints but no usable latent prints were recovered.

The firearm and ammunition it contained were also inspected by ATF Special Agent Mathieu Kelsch, a certified interstate commerce expert.  S/A Kelsch inspected the firearm and each of the rounds

---

4 No .25 caliber shell casings were recovered from the scene.   At the time of **TAVARES**' arrest, a .38 caliber bullet fragment was recovered from the area of 66 Clarkson Street and four .40 caliber shell casings were found on the driveway of 73 Clarkson Street the following morning.

recovered from it, determined that they were a firearm and ammunition under federal law, and also determined that they had been manufactured outside Massachusetts, meaning that they had all crossed a state line or an international boundary prior to being seized in Dorchester on August 4, 2013.

## II.   STIPULATIONS OF FACT

The parties have stipulated that, prior to August 4, 2014, **TAVARES** had been convicted of a crime punishable for a period of more than a year and therefore is a felon for purposes of 18 U.S.C. § 922(g)(1).  A copy of the executed stipulation is attached as Exhibit 6.

No other stipulations are presently anticipated.

## III. EXPERT TESTIMONY

Absent additional stipulations,  the government intends to introduce expert testimony about the firearm from three witnesses: Richard Auclair, a BPD latent print examiner who helped determine that the gun contained no useable fingerprints and that it is unusual to recover identifiable latent prints from firearms; Officer Gary Lewis, the ballistician who test fired the gun and inspected the ammunition it contained and the additional ballistics recovered from the scene both at the time of **TAVARES**' arrest and later that morning, and Mattheu Kelsch, the ATF agent who confirmed that the items recovered from **TAVARES** were in fact a firearm and ammunition within

the meaning of 18 U.S.C. §§ 921(a)(3) & 921(a)(17)(A) and that they have the requisite nexus with interstate commerce.

Negative fingerprint testimony is routinely admitted in firearms cases. See, e.g., United States v. Carpenter, 403 F.3d 9, 10, n.1 (1st Cir.2005) ("To counter [defendant's] contention about the absence of fingerprints on the weapon, the government adduced expert testimony that it is exceedingly difficult to lift viable fingerprints from the surfaces of this particular weapon."); United States v. Coffee, 434 F.3d 887, 897 (6th Cir.2006) (in sufficiency of the evidence challenge, "fact that no identifiable fingerprints were found on either of the revolvers is not determinative, particularly in light of the testimony of the government's expert witness...that fingerprints are rarely identified on firearms, the absence of fingerprints does not mean that an item has not been touched, and mechanics' cracked and gouged hands (defendant was a mechanic) are less likely than those of members of other professions to leave fingerprints."); United States v. Castillo, 406 F.3d 806, 810 (7th Cir.2005) (government expert testified that "guns and ammunition are not very receptive surfaces for leaving fingerprints"); United States v. Williams, 358 F.3d 956, 960 (D.C.Cir.2004) (government introduced expert testimony that "it was difficult to recover a useful fingerprint from a gun and that the absence of any

9

fingerprints on the gun recovered...was not unusual");
Commonwealth v. Evans, 786 N.E.2d 375, 391 (Mass.2003) (state's fingerprint expert testified that guns yield identifiable fingerprints in only about two percent of cases.); United States v. Almaraz, 31 Fed.Appx. 838, n.1 (5th Cir.2002) (unpublished) (fingerprint expert testified that prints on gun and its container were too "smudge or blurred" to be suitable for comparison and that this was "in no way unusual").  The expert in this case, BPD Criminalist Richard Auclair, will base his testimony on years of experience, statistics maintained by the Latent Print Unit of the Boston Police Department, and the available literature regarding the infrequency with which useable prints are recovered from firearms.

Expert testimony will also be offered by ATF S/A Matthieu Kelsch of the, who is a trained ATF interstate commerce nexus expert.  E.g., United States v. Corey, 207 F.3d 84 (1st Cir.2000)("interstate nexus" element of § 922(g) constitutes specialized knowledge for which expert testimony is appropriate).  S/A Kelsch is expected to testify that the frame of the charged firearm was manufactured by Southern Die Casting in Miami, Florida for assembly by Firearms Import and Export Corporation in Miami, Florida.  The slide (which is marked "Made in Italy") was manufactured in Italy by Tanfoglio, Fratelli, S.R.L..  The slide was imported to the United States for use in a domestically produced receiver.

Special Agent Kelsch is also expected to testify that the headstamps on the ammunition located in the charged firearm when it was recovered  are either "F-C 25 Auto," (which indicate that these rounds were assembled by the Federal Cartridge Company in Anoka, Minnesota) or "Win 25 Auto" (which indicates that these rounds were manufactured by Winchester Arms in East Alton, Illinois). This is all the government need show to establish that the charged firearm and ammunition have the required nexus with interstate commerce. E.g., Corey, 207 F.3d at 88 (government's burden regarding interstate commerce is satisfied if it proves that gun was possessed in a state "other than the one in which it was manufactured").

## IV.  ANTICIPATED EVIDENTIARY ISSUES

1.  **Photographs of the scene**.  The government expects to introduce photographs showing various locations related to this incident.  Although not all photographs were taken on the day that the defendant was arrested, the government believes that they fairly and accurately depict the places involved and are thereby admissible under settled law.  E.g., United States v. Holmquist, 36 F.3d 154, 169 (1st Cir.1994)("A photograph's contents, buttressed by indirect or circumstantial evidence, can form a sufficient basis for authentication even without the testimony of the photographer or some other person who was present at the time it was taken."); United States v. Clayton, 643 F.2d 1071, 1074 (5th Cir.1981)("A witness qualifying

a photograph need not be the photographer or see the picture taken;
it is sufficient if he recognizes and identifies the object depicted
and testifies that the photograph fairly and correctly represents
it."). All were provided to the defendant as part of discovery in
this case.

2. **Rule 609 issues**. The government notes that **TAVARES** has a
substantial criminal record that appears to include convictions that
fall within Rule 609 in the event that he testifies.  The government
will consider further action on this issue once it is provided with
a copy of the defendant's witness list.

3. **911 Tapes.**  The government intends to play four 911 calls
made to the Boston Police Department in the early morning hours of
August 4, 2013.  The first was from a resident of Barry Park who
called about a loud party and a fight on her street that was received
by a BPD 911 Operator at 12:34:02A.M.  This caller stated that "they
are having a party on the street" and requested police assistance.
She described the party as a "flash mob" in the street and stated
that "they were drinking and fighting."  When the caller was asked
how many people were involved, she stated that there were a whole
bunch of them "like maybe 40" and they had the whole street blocked
off with cars.  This caller stated that she was an elderly person
and wished to remain anonymous.  This was the call that brought
Officers Layden, McMenamy, Feliciano and others to this area and can

be found on Turret CD for cc#130485666 as 911 Call-4.  A draft transcript of it is included in Exhibit 7.

The three other 911 calls that the government will seek to introduce each involved the shots fired report on Clarkson Street that came out shortly after Layden and McMenamy arrived at Barry Park and were received between 12:42:44 and 12:43:18A.M., all within a minute or so of the Shotspotter activation.  The first caller stated she was calling from XX Clarkson Street and reported "shots fired." She reported hearing "like 5 shots" from the inside of her house and saw a bunch of people outside her house running.

The next 911 caller reported "a shooting in front of my house at XX Clarkson Street in Dorchester."  This caller reported "a party in front of my house" and stated, "they are shooting someone, I don't know," and also said, "its crazy out there."  This second caller reported "like 3 shots" that he heard from his house.  He left his name and number and told the police, "there's a party out there."

The third caller told BPD's 911 Operator that, "I think there was a shooting on Clarkson Street."  This caller stated that "they were partying" and the "street was all blocked."  The third 911 caller from Clarkson reported he lived at XX Clarkson and said the street was "loaded."  This caller also reported that people were running all around and announced that the police were arriving.  This caller identified himself as Henry. These calls can be found on Turret

13

CD for CC#130485686 as 911-01, 911-02, and 911-03.  Draft transcripts for each of the 911 calls are also included in Exhibit 7.

The government is seeking to play these calls both because they are part of the events that took place, see United States v. Liranzo, 385 F.3d 66, 71 (1st Cir.2004)(admitting evidence relevant "in giving the jury the necessary background to understand the police procedures and their reactions"), and also because the 911 calls help to corroborate the testimony of the police officers as to what they heard and saw when they came on scene at Barry Park and what caused them to move down to Clarkson Street where they ended up chasing and recovering a gun from the defendant.

The reported descriptions of the large party on Barry Park and more importantly the shots fired and other activity on Clarkson Street, mirror the conditions described by the officers concerning how many people were out and how the streets were blocked off.  This is crucial in understanding how the officers were able to catch **TAVARES** and recover a gun from him.

For purposes of this trial brief, the government assumes that the 911 calls are offered for the truth of the matters asserted.  See Federal Rule of Evidence 801.  Even with that assumption, the calls are admissible as present sense impressions and/or excited

14

utterances.[5]  They also should be admitted as business records provided the government establishes the foundation under Federal Rule of Evidence 803(b)(6).

### a. **Present Sense Impression**

Present sense evidence is admissible where: (1) the statement describes or explains the event at issue; (2) the declarant observes the event; and (3) the statement is substantially contemporaneous with the event.  Fed. R. Evid. 803(1), Advisory Committee's Notes; 5 Weinstein & Berger, Weinstein's Evidence & 803(1)[01] (2000 ed.).  See also United States v. McElroy, 587 F.3d 73 (1st Cir.2009); United States v. Collins, 60 F.3d 4 (1st Cir.1995).  Strict contemporaneity is not necessary.  United States v. Shoup, 476 F.3d 38, 42 (1st Cir.2007) ("Rules 803(1) and (2) do not require that the statement occur contemporaneously with the event, however, since in many, if not most, instances precise contemporaneity is not possible and hence a slight time lapse is allowable.") (internal quotation marks and citation omitted).

---

5 There is also no viable claim that any part of the 911 calls the government seeks to submit are testimonial, and thus they do not infringe the defendant's Sixth Amendment right to confrontation as construed by Crawford v. Washington, 541 U.S. 36 (2004).  See Davis v. Washington, 547 U.S. 813, 126 S.Ct. 2266, 2273-74, 165 L.Ed.2d 224 (2006) (statements made to a 911 operator "are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency."); United States v. Brito, 427 F.3d 53, 62 (1st Cir. 2005) ("Ordinarily, statements made to police while the declarant or others are still in personal danger cannot be said to have been made with consideration of their legal ramifications.   Such a declarant usually speaks out of urgency and a desire to obtain a prompt response. It follows, therefore, that such statements will not normally be deemed testimonial."); United States v. Cadieux, 500 F.3d 37 (1st Cir. 2005) (questions posed by 911 dispatcher were made with the object of procuring information relevant to providing emergency police assistance and did not therefore violate Crawford).

All of these requirements are satisfied by the 911 calls from both Barry Park and Clarkson Street.  Each of the callers described incidents and activities that had either just happened or were continuing to happen on the streets outside their homes and all the calls came in within a minute or so of the Shotspotter activation. Under these circumstances, courts have not hesitated to admit 911 calls under the present sense impression exception to the hearsay rule.  See, e.g., Cadieux, 500 F.3d at 38 (affirming district court conclusion that statements to a 911 dispatcher could be introduced either as an excited utterance or a present sense impression); see also United States v. Hawkins, 59 F.3d 723, 730 (8th Cir.1995) (911 call admitted as "present sense impression"), vacated on other grounds, 516 U.S. 1168 (1996); United States v. Campbell, 782 F. Supp. 1258 (N.D. Ill.1991) (recording of 911 call was admissible under present sense impression where caller described event which prompted him to call 911, caller was present in store at time of shooting and described event and alleged perpetrator to dispatcher, and delay between event and call did not suggest that there was time for caller to consciously reflect and fabricate story); Miller v. Crown Amusements, 821 F. Supp. 703, 705 (S.D. Ga. 1993) (statements made in a 911 call within 10 minutes of event deemed admissible under Rule 803(1)).[6]

---

6 The fact that some of the callers' statements were made in response to questions

b. **Excited Utterance**.

The 911 calls from Clarkson Street (and to a lesser extent the call from Barry Park) are also admissible as excited utterances under Fed. R. Evid. 803(2).  Rule 803(2) creates a second hearsay exception for "statement[s] relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."  Fed. R. Evid. 803(2).  Its rationale is that "excitement suspends the declarant's powers of reflection and fabrication, consequently minimizing the possibility that the utterance will be influenced by self-interest and therefore rendered unreliable." United States v. Brown, 254 F.3d 454, 458 (3d Cir.2001); see also Joy, 192 F.3d at 766 (7th Cir.1999).

The circumstances utilized in examining whether a statement qualifies as an excited utterance vary with individual situations. Although a lapse of time between the triggering event and the declarant's statement is relevant to whether the declarant made the statement while under the stress of excitement (and, as set forth above, here the calls came in within a minute or so of the Shotspotter activation), it is not dispositive.  See United States v. Cruz, 156

posed by the 911 Operator does not affect admissibility. United States v. Joy, 192 F.3d 761, 767 (7th Cir.1999) (fact that declarant answered dispatcher's questions, rather than giving spontaneous narrative, did not disprove excitement); United States v. Glenn, 473 F.2d 191, 193-194 (D.C.Cir.1972) (the fact that declarations were prompted by questions of "what happened?" and "who did it?" did not destroy their spontaneity).

F.3d 22, 30 (1st Cir.1996) (affirming admission of statements made four hours after event as excited utterance where declarant was likely still suffering from trauma of event).  Other relevant factors include the characteristics of the event, the subject matter of the statement, and the declarant's age, motive to lie and physical and mental condition. See United States v. Marrowbone, 211 F.3d 452, 454-55 (8th Cir.2000).  These requirements have also been satisfied here, where the callers are reporting a startling and dangerous event that had just occurred outside their home, even though the respective demeanors were calmer than what one might expect. While the callers' voices here generally sound composed, their words and the unfolding circumstances they were describing outside their homes belie any notion that their statements were not "excited utterances" within the meaning of Rule 803(2).  See Brito, 427 F.3d at 62 ("The immediacy of the threat, the existence of a clear and present danger, and the fact that no substantial time had elapsed, in combination, severely erode any basis for a finding that the declarant was in a calm and reasoning state when she placed the 911 call."); see also United States v. Clemmons, 461 F.3d 1057, 1061 (8th Cir.2006) (district court did not abuse its discretion in admitting statement as "excited utterance" even though speaker was talking in a calm manner); United States v. Alexander, 331 F.3d 116, 122 (D.C.Cir.2003) (district court did not abuse its discretion in ruling 911 call an "excited utterance"

even though call was made 15-20 minutes after underlying event and caller deviated from monotone only when she became irritated with dispatcher for refusing to send police to her apartment).

### c. __The 911 Calls are admissible as business records__

The government also asks this Court to rule that the 911 calls are admissible as Boston Police Department business records and hence may be admitted into evidence through a keeper of the records witness or certification once the proper foundation has been laid.

As a general matter, the government concedes that standard police reports reflecting investigative matters are not admissible as public documents or business records.  The body of law that has generated around this issue is based on the fact that police reports by their nature contain information that is evaluative, reflect the opinions of the officers, and raise confrontation issues.   See United States v. Grady, 544 F.2d 598, 604 (2d Cir.1976) ("In adopting this exception [to Rule 803(8)], Congress was concerned about prosecutors attempting to prove their cases in chief simply by putting into evidence police officers' reports of their contemporaneous observations of crime.").

911 Calls are vastly different from such reports.  As set forth above, these calls have been consistently held to be "non-testimonial" under Crawford, and admissible under FRE 803(6) because they reflect non-adversarial events that merely document

19

information from third-parties whose statements are otherwise admissible.   The 911 recordings are therefore admissible as business records under FRE 803(6) (records of regularly conducted activity).

Courts have repeatedly held that 911 calls admissible as business records. E.g., United States v. Suggs, 266 Fed.Appx. 258, 262 (4th Cir.2008) (recording of 911 call was admissible under Rule 803(6) because it constituted a record kept in the course of a regularly conducted business activity); United States v. Chen Kuo, 2011 WL 145471, at *11 (E.D.N.Y. Jan.18, 2011)("The court is inclined to agree in this case that the 911 recordings ... would qualify as business records and would thus be admissible despite their hearsay status."); United States v. Dorsey, 2011 WL 1884225, at *6 (S.D.Fla. 2011)("In addition, the 911 tape itself can be admitted as a public record or business record"); Lloyds v. Jones, 2009 WL 2970503 (E.D.Tex.2009) (recordings or transcripts of 911 calls admissible as business record); John v. Masterson, 2010 WL 1957876, at *1 (D.Conn. May 14, 2010) ("The record of [911 telephone call statements] is admissible ... as a 'business record' ...."); United States v. Harper, 2009 WL 140125, at *2-*3 (W.D.N.Y. 2009) ("There does not seem to be any dispute here that the [911 call report] itself meets the requirements for admission as a business record ...."); United States v. Padilla, 1995 WL 261513, at *3 (S.D.N.Y. May 3, 1995) ("[T]he [911] incident records qualify as *qua* documents for admission

under [the business records exception], as records of regularly conducted activity.").

The First Circuit has not specifically addressed the admissibility of such calls under the business records exception. However, at least two of its recent decisions confirm the correctness of all the cases set forth above. In Cadieux (which rejected a Crawford challenge to the admissibility of 911 calls), the district court had admitted the calls as business records and the First Circuit did not even pause to consider that decision. 500 F.3d at 40 (noting that, "The [district] court concluded that the recording was admissible either as a business or public record"). In United States v. Dowdell, 595 F.3d 50 (1st Cir.2010) the First Circuit similarly recognized that booking sheets do not fall within the law enforcement exception to the business records hearsay rule because the matters there were, as here, non-adversarial. As set forth above, a 911 recording is not an evaluative police report, but a recording of private third party's observations independently admissible through other hearsay (excited utterance and/or present sense) exceptions. Because a certificate from the Boston Police Department satisfies the requirements of Rule 803(6) and establishes authenticity and admissibility, the 911 calls are admissible on this basis as well.[7]

---

7 Business and Public records also raise no Crawford issues. E.g., United States v. Munoz-Franco, 487 F.3d 25, 38-39 (1st Cir.2007) ("The Court in Crawford plainly characterized business records as 'statements that by their nature [are] not

### 4. Radio Transmissions

The government also intends to play portions of the radio transmissions generated during this incident.  They include statements made during the chase by the pursuing officers, and statements made by Officer McGrath shortly after **TAVARES** was secured that **TAVARES** had thrown a gun.  These excerpts will be authenticated by the officers who made them.

### V. JURY VOIR DIRE QUESTIONS

The government's proposed jury voir dire are on file.

### VI. PROPOSED JURY INSTRUCTIONS

The government's proposed jury instructions are also already on file.

### VII. SPECIAL ARRANGEMENTS

The government anticipates that it may refer to certain photographs, to the charged firearm, and may make references to 911 calls and the radio transmissions during its opening statement.  The government will address those issues with defense counsel prior to

---

testimonial.'"); United States v. Feliz, 467 F.3d 227, 237 (2d Cir.2006) ("public records are, indeed, non-testimonial under Crawford").

trial.

Respectfully submitted,

CARMEN M. ORTIZ
UNITED STATES ATTORNEY


By:   /s/ John A. Wortmann, Jr.
      JOHN A. WORTMANN, JR.
      Assistant U.S. Attorney


CERTIFICATE OF SERVICE


I hereby certify that this document filed through the ECF system will
be sent electronically to the registered participants as identified
on the Notice of Electronic Filing (NEF).


       /John A. Wortmann, Jr. 7/14/14
       Assistant United States Attorney


Date: 7/14/14